UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 00-6013-CIV-GOLD/SIMONTON

DANIEL MCCARTHY,

  Plaintiff,

v.

U.S.A. PROTECTION, INC., formerly
known as R.A. SECURITY SYSTEMS,
INC., a Florida corporation,

  Defendant.

_____/



## PLAINTIFF'S VERIFIED MOTION FOR ATTORNEY'S FEES AND INCORPORATED MEMORANDUM OF LAW

Plaintiff, DANIEL McCARTHY ("McCarthy"), pursuant to Federal Rule of Civil Procedure 54(d)(2), Local Rule 7.3, 29 U.S.C. § 216(b), and 42 U.S.C. § 1988, moves this Court for entry of an order awarding him attorney's fees,[1] and in support states:

### BACKGROUND

On November 6, 2000, the Court issued a Final Judgment in McCarthy's favor for $28,535.52. The Defendant had defaulted. In the Court's Final Judgment, the Court had specifically reserved jurisdiction to consider a motion for attorneys' fees. McCarthy is the prevailing party in this case. The Supreme Court of the United States has held that a party is a "prevailing party" for purposes of an attorney's fee award if the party "prevailed in some significant issue in the litigation and [has] obtained some of the relief [he or she] sought." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782 (1989); *Farrar v. Hobby*, 506





U.S. 103, 111-13 (1992) (holding that a judgment for any amount of monetary relief—including nominal damages—renders a plaintiff to be a prevailing party). Unquestionably, McCarthy is a prevailing party.

Title 29 U.S.C. § 216(b) of the Fair Labor Standards Act ("FLSA") provides for a prevailing plaintiff to be awarded a reasonable attorney's fee to be paid by the employer. The FLSA provision for attorney's fees is different from that under Title VII (and the other civil rights statutes) in that a fee award under § 216(b) of the FLSA is *mandatory* to a prevailing employee. *Christiansburg v. Garment Co. v. EEOC*, 434 U.S. 412, 415 & n.5 (1978) (noting that § 216(b)'s use of the word "shall" "make[s] fee awards mandatory for prevailing plaintiffs"); *Shelton v. Ervin*, 830 F.2d 182, 183-84 (11th Cir. 1987) (holding that attorney's fees—and costs deemed fees—are an "integral part of the merits of [a] case [in which § 216(b) applies]"); *Hagelthorn v. Kennecott Corp.*, 710 F.2d 76 (2d Cir. 1983). Even under the other civil rights statutes, prevailing plaintiffs are presumptively entitled to attorney's fees, and are thus to be awarded them as a matter of course absent special circumstances. *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983); *Doe v. Busbee*, 684 F.2d 1375, 1378 (11th Cir. 1982); *Dowdell v. City of Apopka*, 698 F.2d 1181, 1189 (11th Cir. 1983); *Duncan v. Poythress*, 777 F.2d 1508 (11th Cir. 1985) (*en banc*) (stating that "prevailing plaintiffs' attorney[s are] presumptively entitled to fees").

Time spent litigating the issues of attorney's fees is also compensable. *Johnson v. University College*, 706 F.2d 1205, 1207 (11th Cir.), *cert. denied*, 464 U.S. 994 (1983). Also, any prosecution or defense of post-trial motion(s), which are obviously necessary to protect the plaintiff's rights, are also compensable. *Turner v. Orr*, 785 F.2d 1498, 1504 (11th Cir. 1986)

---

[1] McCarthy does not request that a hearing be held on this Motion. This Motion only covers up to November 30, 2000, and therefore McCarthy will be filing supplemental motions for attorney's fees in

(stating that "[p]ost-judgment efforts . . . directed toward the protection of those rights originally vindicated by the . . . judgment [are compensable] regardless of the outcome of each individual post-effort involving litigation").

## MEMORANDUM OF LAW

### I.    THE APPLICABLE LEGAL STANDARDS FOR DETERMINING ATTORNEY'S FEE AWARDS

#### A.    A Historical Backdrop for Court-Awarded Attorney's Fees

The lengthy history of court-awarded attorney's fees is summarized in the Supreme Court's decision in *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247-64 (1975). The *Alyeska* Court noted that the starting point is that fees ordinarily are not allowed to be awarded, since "[i]n the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorney's fee from the loser." *Id.* at 247. The major exception to this general rule arises when Congress (or a state legislature), in derogation of the common law, authorizes an award of attorney's fees by enacting a fee-shifting statute, so as to encourage "private enforcement to implement public policy and to allow counsel fees so as to encourage private litigation." *Id.* at 263. Such statutes normally permit courts to award attorney's fees to the prevailing party or sometimes only the prevailing plaintiff. *Id.* at 261-62.

Congress' response to the Supreme Court's opinion in *Alyeska* was swift and conclusive. It enacted the Civil Rights Attorneys' Fee Award Act of 1976, codified at 42 U.S.C. § 1988, which governs the award of fees in actions brought pursuant to the Reconstruction Civil Rights Acts, 42 U.S.C. §§ 1981 – 1986, and to Title VII. The Eleventh Circuit has held that case law which addresses the reasonableness of awards of attorney's fees under § 1988 applies to cases involving the enforcement mechanism of the FLSA. *Jones v. Central Soya Co.*, 748 F.2d 586, 589 & n.1 (11th

---

the future for time spent executing the judgment.

Cir. 1984) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 n.7 (1983) (stating that "standards set forth in this opinion are generally applicable in all cases in which Congress has authorized an award of [attorney's] fees to a 'prevailing party'")). The Fees Act's legislative history was designed to shift the cost of attorney's fees to losing defendants in civil rights cases of all types in order to pay for plaintiffs' lawyers to implement what the *Alyeska* Court characterized as the "private-attorney-general concept."

**B.**    **The Eleventh Circuit's Standards for Assessing Attorney's Fees**

The Eleventh Circuit's current standards for measuring attorney's fees are set out in *Norman v. Housing Auth. of the City of Montgomery*, 836 F.2d 1292, 1298-99 (11th Cir. 1988) (*en banc*), wherein the court surveyed the fee-award jurisprudence of both the Supreme Court and the Eleventh Circuit, and reiterated that a fee award should be based upon a multiplication of a reasonably hourly rate (that is, "the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation"), *Id.* at 1299, by the number of "reasonable hours" billed, *Id.* at 1301, which equals the "lodestar", and this resulting lodestar can be increased or decreased for the results obtained, the quality of representation, and for any delay in payment. *Id.* at 1302. Put another way:

(reasonable hourly rate) x (reasonable hours billed) = lodestar.

The lodestar can then be adjusted. This "lodestar" method effectively replaces the balancing effect that was previously prescribed by *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 117-19 (5th Cir. 1974), which was known as the twelve (12) *Johnson* factors.[2]    However, the twelve

---

[2] The twelve *Johnson* factors, as summarized in *Dowdell v. City of Apopka*, 698 F.2d 1181, 1187 n.8 (11th Cir. 1983), are:

    a.    the time and labor required;
    b.    the novelty and difficulty of the questions;
    c.    the skill requisite to perform the legal service properly;

*Johnson* factors still "might be considered in terms of their influence on the lodestar amount." *Norman*, 836 F.2d at 1299. The next four subsections discuss: 1) the reasonable hourly rate; 2) assessing the hours billed; 3) the lodestar; and 4) adjusting the lodestar, in turn.

### 1. Establishing A Reasonable Hourly Rate

The "going rate" in the legal community is the most critical factor in determining a reasonable fee. *Martin v. University of South Alabama*, 911 F.2d 604, 610 (11th Cir. 1990). The pertinent "legal community" used to base an applicable hourly rate is the city where the plaintiff's attorney has his office, not where the case was tried. *Brooks v. Georgia State Bd. of Elections*, 997 F.2d 857, 868-69 (11th Cir. 1993). The plaintiff's attorney bears the burden of producing satisfactory evidence that the requested rate is in line with the going rate. *Norman*, 836 F.2d at 1299. Satisfactory evidence is more than the affidavit of the plaintiff's attorney, and such evidence should pertain to rates actually billed and paid in similar suits. *Id.* "Evidence of rates may be adduced through direct evidence of charges by lawyers under similar circumstances or by opinion evidence." *Id.* The weight to be given to opinion evidence is affected by the detail contained in the testimony on matters such as similarity of skill, reputation, experience, similarity of case and client, and breadth of the sample of which the expert has knowledge. *Id.*

Undersigned counsel is requesting that he be awarded $250.00 per hour in this case for legal fees. The $250.00 hourly fee is commensurate with his knowledge and experience.

---

| | |
|---|---|
| d. | the preclusion of other employment by the attorney due to the acceptance of the case; |
| e. | the customary fee; |
| f. | whether the fee is fixed or contingent; |
| g. | time limitations imposed by the client or other circumstances; |
| h. | the amount involved and the results obtained; |
| i. | the experience, reputation, and ability of the attorney; |
| j. | the "undesirability" of the case; |
| k. | the nature and length of the professional relationship with the client; and |
| l. | awards in similar cases. |

(*Affidavit of Loring N. Spolter*, attached hereto as Exhibit "1"); (*Affidavit of Christopher C. Sharp*, attached hereto as Exhibit "3"); (*Affidavit of Peter Mavrick*, attached hereto as Exhibit "3"). Undersigned counsel has concentrated in the area of labor and employment law for the past seven (7) years, and has been practicing law for 11 years. He is admitted to practice law in Florida, New York, and Connecticut. Additionally, he has written extensively in the area of employment discrimination law, and, among other places, he has been published several times in *The Wall Street Journal's* National Business Employment Weekly.

Other lawyers in the community agree that undersigned's hourly fee request of $250.00 per hour is commensurate with his experience, given that the fees for plaintiffs' attorneys in the Southern District of Florida range from $175.00 per hour to $350.00 per hour. (*See Affidavits of Other Attorneys*, attached hereto as Exhibit "3"). Therefore, undersigned should be awarded $250.00 per hour for legal fees in this case.

Moreover, another important concept to the determination of an attorney's worth is an assessment of the attorney's skill. *Johnson*, 488 F.2d at 718. This criterion is addressed to the trial judge's assessment of the attorney based on his observation of "the attorney's work product, his preparation, and general ability before the court." *Id.* In making this assessment, the district court is to apply its expertise gained from the judge's career both as a lawyer and as a judge. *Id.* This criterion asks, initially, whether plaintiff's counsel was competent and experienced to do the job assigned, and thereby determining whether he or she is deserving of the going commercial rate for lawyers engaged in litigation in federal court.

As it is for the jury to remember what the testimony presented was, it is for the district court to remember the performance of counsel. As stated by the Eleventh Circuit:

> Throughout, and particularly if litigation is begun, the word 'skill' incorporates the notions of organization and efficiency. An attorney of great skill

organizes his thoughts, his work, and his presentation in a logical and orderly way without lost motion or false starts so that each move builds upon the last to the achievement of the goal. Organization means that discovery devices and motions are thought out and not utilized in a random or erratic way or for the mere purpose of going through established routines. Efficiency means doing well just what ought to be done and doing it in a minimum of time.

The underpinning for these facts of legal skill is knowledge, knowledge of trial practice and knowledge of substantive law. A lawyer who has to educate himself generally in either or both of these two areas may ultimately be as effective as a specialist, but he has no right to expect to be reimbursed at the same rate as a lawyer who begins his preparation with the finer points raised by the particular case.

The final attribute of legal skill is perhaps the one the general public thinks of first – persuasiveness. Some clients prevail only because of the compelling merit of their case and in spite of their attorney's efforts to communicate a position. In other cases, usually close ones, the better advocate may actually sway the outcome on occasions. In the usual case, both the merits and the advocacy control the outcome. The measure of good advocacy is that the client's best positions are advanced clearly, crisply and compellingly.

*Norman*, 836 F.2d at 1300-01.

Specialization, and the attendant economies of time that result, is a ground for awarding an hourly rate at the high end of the spectrum. For, as the court observed in *White v. Alabama*, 1996 Lexis 9347, *1 (N.D. Ala. 1996), a voting rights case in which the court found that the plaintiff's attorney's "expertise enabled them to prosecute th[e] case very efficiently,":

attorneys with less knowledge and experience would have taken many more hours to pursue this litigation. Therefore, Agricola's and Jordan's 'efficiency justifies an hourly rate at the high end of the customary range.' *Gay Lesbian Bisexual Alliance v. Sessions*, [843 F. Supp. 1424 (M.D. Ala. 1996)]; *see also Coleman v. Cannon Oil Co.*, 911 F. Supp. 510, 515 (M.D. Ala. 1995) ("A lawyer already skilled in the area could demand a higher rate because he or she would be more knowledgeable and could work more efficiently"); *Dillard v. Citry of Elba*, 863 F. Supp. 1550, 1553 (M.D. Ala. 1993) (experienced attorneys prosecuted case in fewer hours than inexperienced attorneys would have); *Curry v. Contract Fabricators Inc. Profit Sharing Plan*, 744 F. Supp. 1061, 1071 (M.D. Ala. 1988) (attorney's "inexperience should be reflected in [lower] . . . hourly rate"), *aff'd*, 891 F.2d 842 (11th Cir. 1990).

*Id.* at *14-15.

In this case, undersigned exhibited outstanding skill, which is apparent from the Final Judgment. Accordingly, undersigned's skill should be taken into account when determining his hourly rate.

### 2. Assessing a Reasonable Number of Hours

The prevailing party need only submit evidence indicating what the hours worked were. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The Supreme Court has stated the following with respect to the assessment of whether the number of hours submitted is reasonable:

> Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified.

*Id.* at 435. Finally, if a plaintiff is successful as to all (or his only) legal theory, plaintiff's counsel is entitled to all of his fee. *Id.* at 434-35. The Eleventh Circuit has agreed with this rationale, and stated that: "If the result was excellent, then the court should compensate for all hours reasonably expended." *Norman*, 836 F.2d at 1302.

First, the attached documentation in the form of undersigned's time records (Exhibit "2") should be more than enough evidence as to undersigned's reasonable hours worked. The hours total 35 (as of December 1, 2000). Undersigned counsel submits that the number of hours is not only reasonable but also a very low figure as compared to most FLSA cases. Moreover, McCarthy alleged one legal theory of relief: that Defendant violated the Fair Labor Standards Act. McCarthy was successful on this theory, and therefore, pursuant to *Hensley* and *Norman*, he is entitled to his entire fee; that is, he is entitled to be compensated for all of the hours in which he worked.

### 3. The Lodestar

The lodestar (reasonable hourly rate) x (reasonable hours billed) in this case is:

$$250.00/hr \times 35 \text{ hrs} = \$8,750.00.$$

8

### 4. Adjusting the Lodestar

Having determined the lodestar by multiplying the reasonable hourly rate by a reasonable number of hours worked, the Court may then adjust the lodestar, as discussed above, upward or downward, for 1) degree of success and/or 2) delay in payment. *Norman*, 836 F.2d at 1302. These two factors will be discussed in turn.

First, the degree of success was total. McCarthy was successful as to his one legal theory, the violations of the Fair Labor Standards Act; therefore the lodestar should be enhanced accordingly. Second, with respect to the delay in payment, the Supreme Court has stated that an award of attorney's fees should ordinarily include "an appropriate adjustment for delay in payment . . . ." *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 283 (1989). Courts usually compensate for the delay in payment by either basing the award on current rates or by adjusting the fees based on historical rates to reflect its present value. *Id.* McCarthy brought this action some months ago. McCarthy's counsel, to this day, has not been paid any amount toward his fee. Accordingly, the lodestar should be adjusted upward to reflect the delay in payment. McCarthy asserts that the degree of his success and the delay in payment warrants that the lodestar be adjusted upward, and he requests that this Court adjust the lodestar upward by 25%. The lodestar $8,750.00 adjusted upward by 25% ($8,750.00 x 1.25) = $10,937.50.

## **CONCLUSION**

Based on the foregoing, McCarthy respectfully requests that this Honorable Court award

him $10,937.50 in attorney's fees.

Respectfully submitted,

LORING N. SPOLTER, P.A.
2455 E. Sunrise Blvd
Suite 807
Fort Lauderdale, Florida 33304
Tel. (954) 728-3494
Fax. (954) 563-2252

By
Loring N. Spolter Esq.
Fla. Bar No. 0864196

## VERIFICATION

I, Loring N. Spolter, Esq., as attorney for Daniel McCarthy, having first been duly sworn

in accordance with law, do hereby depose and state that I have read the foregoing Motion for

Attorney's Fees, and that the attorney's fees sought to be awarded against the Defendant herein,

with further supporting documentation attached hereto, are true and correct to the best of my

knowledge and information.   I further assert that I have fully reviewed the time records and

supporting data and that this Motion is well grounded in law and fact, and is justified.

LORING N. SPOLTER

STATE OF FLORIDA

COUNTY OF Broward

BEFORE ME, the undersigned authority, personally appeared Loring N. Spolter,
personally known to me or who produced personally known as identification, and who,
after being duly sworn, stated under oath that he/she signed the foregoing Motion for Attorney's
Fees on behalf of _____, and they are
true and correct to the best of his/her knowledge and information.

SWORN TO AND SUBSCRIBED before me, this 1st day of December, 2000.

NOTARY PUBLIC

My Commission Expires:

Dated this 1st day of December, 2000.



Susan J. Corey
MY COMMISSION # CC941750 EXPIRES
June 4, 2004
BONDED THRU TROY FAIN INSURANCE, INC.

11

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been duly

furnished by ~~hand delivery~~ to: Rod Steadman, Registered Agent of the above-named Defendant,

19371 S.W. 118th Court, Miami, Florida 33177, Robert Odierna, Sr. or Jr., c/o Go Wireless, 3399

N.W. 72nd Avenue, Suite 201, Miami, Florida 33179, this ____ day of December, 2000.

By: _____

Loring N. Spolter Esq.
Fla. Bar No. 0864196

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 00-6013-CIV-GOLD/SIMONTON

DANIEL MCCARTHY,

      Plaintiff,

v.

U.S.A. PROTECTION, INC., formerly
known as R.A. SECURITY SYSTEMS,
INC., a Florida corporation,

      Defendant.

_____/

### AFFIDAVIT OF LORING N. SPOLTER

STATE OF FLORIDA     )
                       ) ss
COUNTY OF BROWARD  )

      The undersigned, LORING N. SPOLTER, first being duly sworn according to law, deposes and states:

      1.    I am the sole shareholder in my law firm Loring N. Spolter, P.A., which firm is counsel of record for Plaintiff Daniel McCarthy in the above-styled lawsuit.

      2.    The attached time records (which are attached as Exhibit "2" to McCarthy's Motion for Attorney's Fees) have been fully reviewed by undersigned, and the time records are true and correct copies of all attorney's fees incurred to date in the prosecution of this action.

      3.    The attached time records, when added together, total $8,750.00, which is arrived at by multiplying 35 hours spent by $250.00 per hour fee charged by undersigned.

      4.    All of the legal work performed in this case, as represented in detail in the attached time records, was necessary for the proper prosecution of this cause.

5.    The $250.00 hourly fee is commensurate with my knowledge and experience.  I have concentrated in the area of labor and employment law for the past seven (7) years, and I have been practicing law for 11 years.  I am admitted to practice law in Florida, New York, and Connecticut.  Additionally, I have written extensively in the area of employment discrimination law, and, among other places, I have been published several times in *The Wall Street Journal's* National Business Employment Weekly.

6.    Other lawyers in the community agree that my hourly fee request of $250.00 per hour is commensurate with my experience, given that the fees for plaintiffs' attorneys in the Southern District of Florida range from $175.00 per hour to $350.00 per hour.  (*See Affidavit of Peter Mavrick* and *Affidavit of Christopher C. Sharp*, attached to McCarthy's Motion for Attorney's Fees as Exhibit "3").

7.    The request for fees is well grounded in law and fact, given that Jack McCarty is the prevailing party upon a jury's verdict.

8.    Attached to McCarthy's Motion for Attorney's Fees (as Exhibit "4") is the fee agreement entered into by Daniel McCarthy and my firm entitled Loring N. Spolter, P.A.

FURTHER AFFIANT SAYETH NAUGHT.

Loring N. Spolter

2

SWORN TO and SUBSCRIBED before me this _15_ day of _December_, 2000, by Loring N. Spolter, who is <u>personally known to me</u> or who produced _____, as identification, and who did take an oath.



_____
NOTARY PUBLIC, STATE OF FLORIDA

My Commission Expires:

Susan J. Corey
MY COMMISSION # CC941750  EXPIRES
June 4, 2004
BONDED THRU TROY FAIN INSURANCE, INC.

3

*reprinted from the*
# National Business Employment Weekly
April 14 - April 20, 1996     *Published by The Wall Street Journal ©1996 Dow Jones & Company, Inc. All Rights Reserved.*

# When Your Firing Was Unfair

## By Loring N. Spolter

After hearing that she would be laid off from the real-estate division of the major South Florida bank where she worked, one executive asked for and received photocopies of notes her boss had written about her for his files. While the executive had received numerous promotions and a string of favorable performance reviews, she often missed one to two days of work each month due to endometriosis, a painful gynecological ailment for which she sought treatment.

Her boss's handwritten notes turned out to be the equivalent of a smoking gun. He'd written that until her attendance improved, the executive would never be promoted, even though other records revealed that she outperformed her colleagues. Surprisingly, these notes were never submitted to the human-resources department.

In a lawsuit that followed, the executive asserted that the bank violated the Americans with Disabilities Act and the Family and Medical Leave Act by discriminating against her—a productive, capable employee—solely because of her need to take one or two sick days each month. A decision is still pending.

Sexual harassment, age discrimination, anti-pregnancy bias, discrimination against people with disabilities and prejudicial acts based on religion, race or national origin occur with alarming frequency at some companies. No employee is immune from the possibility of experiencing illegal discrimination.

If you believe that you're being victimized by job bias, review the following suggestions which can protect your rights and enhance the strength of your legal claim:

★ It's vital to accumulate evidence early on, since evidence not quickly gathered often becomes impossible to obtain later. Had the bank executive not requested a copy of her personnel records before she was fired, it's unlikely she would have had a second opportunity to secure these documents. Just months after she was laid off, her boss was let go, making his notes virtually irretrievable.

To enhance the likelihood of receiving a copy of your personnel file, ask for it prior to an anticipated firing or before filing a job-bias complaint. Also, make certain you use only legal means to collect evidence. Otherwise, the methods you use to gather material can be held against you.

★ File formal complaints of workplace discrimination with the correct government agencies. Complaints concerning most types of illegal discrimination must be filed with the U.S. Equal Employment Opportunity Commission, and should be filed simultaneously with state and local agencies that review discrimination charges.

The EEOC lacks jurisdiction over violations involving the Family and Medical Leave Act, so for these you must contact the U.S. Department of Labor, which oversees compliance of this new federal law. It also permits the filing of private lawsuits without prior contact with the agency.

## If you win your lawsuit, the lawyer's contingency payment is usually 33% to 40% of the amount you collect

*Victims of job bias must document their cases and seek support while the charges are fresh*

Some job discrimination complaints involve numerous laws overseen by multiple agencies.

★ You must file complaints and initiate lawsuits prior to the expiration of strict deadlines, which vary by state. By failing to act in a timely fashion, you may lose your legal rights. You have 300 days to file a complaint with the EEOC, but the filing deadline may be shorter in states that don't maintain their own employment commissions.

★ Consider hiring an attorney with experience in employment-discrimination litigation. Most job-bias victims don't know which law or laws may apply in their cases. Non-attorneys at government agencies almost always write initial complaints, although they aren't always familiar with all the laws involving other agencies (or sometimes even their own agencies). Incomplete and improperly worded legal documents can destroy even the strongest case. The EEOC and many other agencies allows private attorneys to draft these documents on behalf of their clients.

Private attorneys can take action long before government agencies start their reviews. The EEOC, for example, often waits one year or more after receiving a complaint before performing more than a cursory review. Recent furloughs of the agency's staff members have caused even further delays.

Most attorneys will accept job-bias cases on a *(over please)*

*Mr. Spolter is a trial attorney in Fort Lauderdale, Fla., and on the teaching faculty of the National Employment Lawyers Association.*

combination contingency/retainer basis, plus expenses. The typical retainer ranges from $2,000 to $5,000, and many lawyers offer payment plans. If you win, the lawyer's contingency payment is usually 33% to 40% of the amount you collect.

★ If you anticipate filing a job-bias complaint against an employer you currently work for, watch out for illegal retaliation. Though it's unlawful to punish workers for filing job-bias complaints, many companies do so. Consider sending photocopies of the job-bias complaints you filed with the government to your boss or to the company's HR department via certified, return-receipt mail.

With proof showing that you mailed these items, you can demonstrate that your company was made aware that a job-bias complaint was filed prior to a demotion or firing. Such evidence will bolster any claims you make of illegal retaliation.

★ Maintain a log of important bias incidents and responses that occur at the office. Events are usually forgotten unless promptly written down.

★ Seek favorable witnesses, but don't be surprised when even good friends are afraid to come forward. Keep abreast of colleagues who have quit or are fired. Because they're no longer financially dependent on the employer, these witnesses can be extraordinarily valuable.

Customers, clients and other outsiders should be lined up as witnesses, too. Unlike co-workers who may fear alienating the company, outsiders often are willing to sign affidavits indicating how fired workers demonstrated valuable expertise and represented

## 'People who are fired for cause can make changes and learn from their mistakes, but victims of discrimination are unable to alter what makes them vulnerable to abuse'

their organizations well. Lacking personal motivation to take sides, clients and customers have excellent credibility and can strengthen claims that firings and demotions were unwarranted.

★ If fired, start looking for work immediately, since attorneys representing your former employer will want to know how aggressively you sought work to minimize your out-of-pocket damages. Maintain a diary of all job-search efforts, including letters, phone calls and interviews.

★ Workplace discrimination causes anguish and anxiety. Meeting with a psychologist or social worker can help heal emotional wounds and document your emotional pain and suffering.

"Disrupted sleep patterns, diminished enjoyment of things once cherished, changed eating habits and frayed family relationships commonly accompany the anger and depression which follows the loss of one's job," says Michael Rappaport, a Miami psychologist.

"Discriminatory firings hurt even more than terminations for justifiable reasons, because people who are fired for cause can make changes and learn from their mistakes," he adds. "Victims of employment discrimination are unable to alter what makes them vulnerable to abuse."

★ Look for satisfaction and happiness outside of work (or your legal battle). Job-bias disputes typically resemble marathons, not sprints. Maintaining a positive outlook will enhance your likelihood of finding a new position and also achieving success in your lawsuit. More importantly, it will help you maintain your physical well-being and mental health. ●

This reprint prepared by the National Business Employment Weekly for informational purposes only. No copy of this reprint or any portion thereof may be made without the express written consent of the National Business Employment Weekly. For subscription information call: 800-JOB-HUNT (800-562-4868).

reprinted from the
# National Business Employment Weekly

July 26 - August 1, 1998      *Published by The Wall Street Journal ©1998 Dow Jones & Company, Inc. All Rights Reserved.*

■ COVER STORY ■

# *When Employers* Retaliate



*Filing a discrimination suit may lead to reprisals, but you can strike back in court with expanded rights*

---

**By Loring N. Spolter**

---

James Woodson, a chemical engineer with Scott Paper Co. in Philadelphia, grew suspicious when told he was being laid off. Mr. Woodson, an African-American, was one of just two employees terminated from his 22-person department. The only other worker laid off was also black.

Previously, Mr. Woodson had filed three complaints with the U.S. Equal Employment Opportunity Commission (EEOC), stating that he was wrongly bypassed for promotions by less experienced white employees. Those complaints were pending at the EEOC when Mr. Woodson was let go.

At trial, jurors concluded that Mr. Woodson was not victimized by racial bias.

*(over please)*

---

*Mr. Spolter is a trial attorney in Fort Lauderdale, Fla., and on the teaching faculty of the Florida Employment Lawyers Association.*

However, they concluded that Scott Paper had illegally retaliated against him for filing a complaint of racial discrimination. Jurors awarded Mr. Woodson $1.55 million, which included $1 million in punitive damages and $10,000 for emotional pain and suffering. Afterward, the trial judge slightly reduced the verdict by $70,000, stating jurors had wrongly calculated Mr. Woodson's future wage losses.

### Illegal to Retaliate

Mr. Woodson is among a growing number of employees who claim that employers have retaliated against them for complaining that they or co-workers have been harmed by on-the-job bias.

Since 1990, the number of EEOC complaints received for discriminatory claims of all types has increased by 26%, to 80,624 in 1997 from 63,898. In comparison, more than 83,000 retaliation complaints were filed during this period. In 1997, the number of these complaints more than doubled the total lodged in 1991 (see accompanying chart).

Federal law prohibits employers from retaliating against workers who complain about illegal bias on the job, even when these reports are later determined to be erroneous. Many states have similar laws. Employees who file complaints with governmental agencies or express their concerns solely within their organizations are protected.

The EEOC regulations specify that anti-retaliation rules should be liberally construed in favor of employees who file good-faith complaints of discrimination. The intent is to protect them against being fired, demoted, reassigned or other suspect staff changes after they report conduct they believe to be illegally discriminatory.

The anti-retaliation rules also protect employment-law "whistleblowers." When hearing the term whistleblower, most people think of a factory supervisor who fears being fired after telling a higher-up about pollutants in the plant's waste water, or a vice president who informs a chief executive officer that other top executives are committing fraudulent acts. In this case, employees who inform employers or governmental agencies of staffing practices they believe to be illegal are protected.

### What's Covered

Retaliatory firings are illegal. However, other adverse employment actions, subtle or overt, taken in retaliation for filing an EEOC complaint can also be illegal. Courts have ruled that these actions may be illegal retaliation:

1. Stripping away supervisory or other previously held responsibilities.
2. Refusing to promote an employee who won't agree to drop an employment discrimination claim.
3. Bad-faith lateral transfers, including moves that don't impact salary or benefits.

4. Selective enforcement of workplace rules.
5. Unfairly placing critical remarks in an employee's file or refusing to insert objective or favorable comments.
6. Subjecting an employee to "silent treatment" or other hostilities.
7. Creating an intolerable environment which induces the employee to resign.
8. Denying a transfer which ordinarily would have been approved.



9. Greater scrutiny of an employee's behavior to build a case against him or her.
10. Filing a bad-faith, meritless lawsuit against the complaining employee.

### Ex-Employees Gain Rights

Until recently, some federal courts refused to permit former employees to file lawsuits against organizations which didn't employ them when the alleged retaliatory acts occurred.

Charles Robinson, a former employee of Shell Oil Co., claimed that after he left the company, it gave a negative job reference about him to a potential employer. Mr. Robinson claimed Shell had intentionally struck back against him because he had filed an EEOC complaint against the company. But a federal judge dismissed his case, ruling that anti-retaliation rules didn't apply to an organization which no longer employed him.

This year the U.S. Supreme Court overturned the trial judge's decision to throw out Mr. Robinson's lawsuit and ordered all federal judges to include former employees

within the protective umbrella of anti-retaliation laws.

Besides providing intentionally false references about former employees, other types of retaliatory conduct can include:

1. Withholding a final paycheck.
2. Threatening to reduce retirement benefits if former employees assist in employment bias cases brought by others.
3. Filing false criminal charges.
4. Mentioning during a job-reference inquiry that the former employee filed a discrimination claim.
5. Telling a potential employer that the former employee resigned because he thought he was being discriminated against.
6. Refusing to re-hire or threatening not to re-hire a rehireable former worker.

### Why More Retaliation Claims?

No one theory explains why retaliation complaints have steadily and significantly escalated. Lawyers defending management against employees' job-bias claims speculate that employees and their attorneys are filing retaliation claims because it's difficult to defend against them. However, just a small percentage of persons filing EEOC complaints are represented by counsel. This means most wouldn't have been advised by attorneys that they may have retaliation claims in addition to discrimination complaints.

Another possibility exists, although EEOC statistics aren't detailed enough to prove it. Even before the U.S. Supreme Court ordered federal judges to recognize that former employees are covered by anti-retaliation laws, an increasing number of judges

## In 1997, the number of retaliation complaints more than doubled the total lodged in 1991



### New EEOC Cases By Complaint Type

| Year | Racial | Sex | Ethnic Origin | Religion | Age | ADA* | Retaliation |
|------|--------|--------|--------|----------|--------|--------|-------------|
| 1990 | 29,191 | 17,422 | 6,418 | 1,160 | 14,719 | NA | 7,579 |
| 1991 | 27,525 | 21,482 | 7,126 | 1,337 | 17,449 | NA | 7,906 |
| 1992 | 29,042 | 23,905 | 7,393 | 1,444 | 19,350 | 999 | 10,932 |
| 1993 | 31,688 | 25,860 | 7,414 | 1,546 | 17,491 | 15,242 | 12,644 |
| 1994 | 31,656 | 26,181 | 7,035 | 1,581 | 17,009 | 18,808 | 14,415 |
| 1995 | 29,986 | 23,813 | 6,687 | 1,564 | 17,425 | 19,778 | 15,342 |
| 1996 | 26,287 | 24,728 | 6,712 | 1,709 | 15,665 | 17,954 | 14,412 |
| 1997 | 29,199 | 24,728 | 6,712 | 1,709 | 15,785 | 18,045 | 18,113 |

\* Americans with Disabilities Act employment provisions became effective July 1992.

Source: U.S. Equal Employment Opportunity Commission

had been permitting lawsuits for alleged retaliatory acts which occurred after employees left former employers. As a result, the pool of potential plaintiffs has expanded to include former employees of vengeful employers.

Attorneys who represent employees in job-discrimination lawsuits theorize the increase is due to employers becoming increasingly vindictive against those who complain about discriminatory treatment. Daniel Goldberg, a Minneapolis attorney who represents workers in bias claims, says fewer employers are resolving employment claims prior to lawsuits being filed. As a result, "more workers than ever have filed claims of discrimination and are still working for the employers they're complaining about," he says. "When adversely treated, these employees are willing to lodge complaints of retaliation."

Jay Asher, a Fort Lauderdale, Fla., consultant who implements diversity training and discrimination-prevention programs for employers, blames corporate downsizing for management's greater willingness to "kill messengers bearing bad news." With fewer subordinates tackling increased workloads, managers feel overburdened, says Dr. Asher.

Many managers wrongly view bias complaints, which are typically unanticipated, as distractions to be avoided with "quick fixes," he says. By taking short-term steps, managers are delaying difficulties which could escalate over time.

"Unless confronted, discrimination issues get bigger as they pop up again and again," says Dr. Asher.

Regardless of the reasons, more employees are taking legal action when they believe their complaints about job bias have led employers to retaliate against them. As the verdict in the Woodson v. Scott Paper Co. case indicates, jurors can be sympathetic to claims of reprisals, even when they don't believe complaints of illegal discrimination. ■

# Reducing the Odds of Retaliation

The federal government and most states prohibit employers from retaliating against employees who complain about workplace discrimination. If you're victimized by illegal job bias, you can protect your rights, enhance the strength of your discrimination claim and prevent reprisals from occurring. These tips may be helpful:

**1. File formal complaints with the correct governmental agencies.**

Prior to commencing a lawsuit, you must file a complaint concerning most types of illegal discrimination with the EEOC. If your state or community has an anti-discrimination agency, file a complaint there, too. State laws can sometimes provide greater recourse than federal provisions. Certain government jobs require that complaints be reported within internal grievance systems.

The U.S. Department of Labor has jurisdiction over complaints involving the Family and Medical Leave Act. Unlike the EEOC, it permits private lawsuits to be filed without prior contact with the agency.

**2. Consider hiring an attorney who has experience in employment-law.**

Most job-bias victims don't know which laws may apply in their cases. Nonattorneys at government agencies almost always write initial complaints, though they aren't always familiar with other available laws (including some within the jurisdiction of their agencies). Incomplete or inconsistently worded affidavits can destroy even the strongest of cases.

Agencies allow private attorneys to draft these documents on behalf of their clients, and private attorneys often can take action long before governmental agencies will. The EEOC, for example, files very few lawsuits on behalf of those who lodge complaints.

**3. Initiate legal actions prior to expiration of statutes of limitations, which can be brief in employment-law matters.**

Federal laws have varying reporting deadlines, and state deadlines commonly differ. Failing to act on a timely basis will cause you to lose your legal rights.

**4. Gather evidence early on, but do so legally.**

Evidence not gathered quickly often becomes impossible to retrieve. Consider requesting a copy of your personnel file prior to filing a job-bias complaint. Experienced lawyers know of early-stage strategies which can strengthen discrimination claims.

**5. Document when the employer learned that you complained about job bias.**

Via certified, return-receipt mail, send letters expressing your concerns to your boss and other high-ranking executives. If you previously filed complaints with governmental agencies, include photocopies of these documents.

Meet court requirements of notifying the appropriate persons within the organization by sending letters to your boss, his or her supervisor, the human resources director and senior executives. Sending multiple letters produces clear proof that officials at varying levels knew about your complaint before adverse action began.

If sending letters at a post office, ask for verified proof of mailing. Green post cards returned in the mail prove the employer received your correspondence.

After hearing from you, organizations that are conscientious about workplace fairness will begin prompt investigations and take steps to remedy improper occurrences. Even a less thoughtful organization that's concerned about liability issues will be discouraged from retaliating. If you're unlucky enough to work for an organization which disregards anti-retaliation laws, the steps described here will defeat its claims of being unaware that you lodged complaints prior to a hostile action.

**6. Document important incidents as they happen.**

Keep a diary. Events not written down are quickly forgotten.

**7. Seek favorable witnesses, but don't be surprised if good friends fear coming forward.**

Keep in touch with co-workers who later quit or are fired. Once they aren't financially dependent on a discriminatory employer, these witnesses can be invaluable.

**8. If fired, start looking for work.**

You're required to minimize your out-of-pocket damages by beginning a job search immediately. Document all job-hunting efforts and activities.

**9. Seek support from professionals.**

Workplace discrimination causes anguish and anxiety. Meeting with a psychologist or social worker can help heal emotional wounds and help you document your emotional pain and suffering. "Disrupted sleep patterns, diminished enjoyment of things once cherished, changed eating patterns and frayed family relationships commonly accompany the anger and depression which follows the loss of one's job," says Michael Rappaport, a Miami psychologist.

He adds that a discriminatory firing hurts more than a termination for justifiable reasons. "People who are fired for cause can make changes and learn from their mistakes," says Dr. Rappaport. "Victims of employment discrimination are unable to alter what makes them vulnerable to abuse."

**10. Seek satisfaction and happiness outside of your workplace or legal battle.**

Job-bias disputes are typically marathons, not sprints. Maintaining a positive outlook will enhance your likelihood of legal success, as well as being hired by another employer. Most importantly, having a good attitude helps you maintain physical and emotional well-being. ■

— *Loring N. Spolter*

reprinted from the
# National Business Employment Weekly

| April 25-May 1, 1999 | *Published by The Wall Street Journal ©1999 Dow Jones & Company, Inc. All Rights Reserved.* |

■ C O V E R   S T O R Y ■

# Defamed *at Work*

## Employees seek their good names back

**By Loring N. Spolter**

**R**ick Perez of San Antonio, Texas, was about to close on a contract to buy the Ford dealership where he'd been working as general manager. Unexpectedly, the deal fell through and he was fired.

Within hours, rumors spread throughout town that Mr. Perez was a criminal. Mistruths became even more embellished as talk had it that he was transporting cars stolen from the dealership to Mexico, was under FBI investigation and had been seized from work in handcuffs by police. In fact, Mr. Perez never was arrested and criminal charges were never filed.

Mr. Perez sued his former employer for defamation of character and backing out on the sale of the dealership. The breach of contract claim settled prior to trial.

At the trial, witnesses testified that employees of the firm, Gillespie Motor, had spread rumors of illegal conduct by Mr. Perez. Jurors awarded Mr. Perez $3.5 million for his emotional pain and suffering and economic damages and then determined the dealership should pay an additional $3.75 million in punitive damages.

Court records show that Mr. Perez is just one of many people across the U.S. suing, often successfully, employers they contend wrongly tarnished their good names. Some examples:

★ Jurors awarded $35,000 for emotional pain and an additional $65,000 in punitive

*Mr. Spolter is a trial attorney in Fort Lauderdale, Fla., and on the teaching faculty of the Florida Employment Lawyers Association.*

damages to a Kansas manager who claimed his employer's press release tarnished his reputation. In a written statement provided to the news media which omitted the former manager's name, the employer stated that he inflated company revenues and may have also committed fraud.

★ A salesman in Minnesota received a $30,000 jury verdict for compensatory damages and another $30,000 in punitive damages against his former employer. After a hostile parting of ways, the salesman's ex-employer sent a letter to his new workplace stating he took confidential business

## Workplace defamation potentially arises any time someone comments about a current or former employee

records. Although the former employer later found the documents in its offices, it never retracted the written accusation.

While there's no central clearinghouse tracking the number of defamation claims arising from workplace disputes, it's generally

believed that an increasing number of people are filing these types of claims. Why? Workplace defamation potentially arises any time someone comments about a current or former employee.

### General Defamation Law

Defamation is the legal term encompassing slanderous spoken remarks and libelous written statements. To claim defamation occurred, the remarks, whether verbal or written, must be untrue.

While laws vary from state to state, most jurisdictions authorize judges to dismiss lawsuits filed against employers having "legitimate" reasons for disclosing information which embarrasses current or former employees. Truthful statements, disseminated on a need-to-know basis, usually shield employers from liability. For example, it would be permissible for a manager to gripe to the human-resources department or to tell inquiring prospective employers about beliefs that an employee had been lazy or slow to learn.

Managers are permitted to comment, when warranted, about individual workers' abilities, performances or attitudes. As one court summarized, the judicial system doesn't wish to silence those having an interest or a legal, moral and social duty from passing along information to those with a legitimate need to know. That's why courts routinely protect the expression of subjective opinions about work-related characteristics to prospective employers or to others within the same workplace. These opinions might regard intelligence, efficient work habits or levels of conscientiousness.

While remarks such as these are generally

*(over please)*

THE PUBLISHER'S SALE OF THIS REPRINT DOES NOT CONSTITUTE OR IMPLY ANY
ENDORSEMENT OR SPONSORSHIP OF ANY PRODUCT, SERVICE, COMPANY OR ORGANIZATION.
*JournalReprints* (609)520-4328  P.O. Box 300  Princeton, N.J. 08543-0300.  DO NOT EDIT OR ALTER REPRINTS • REPRODUCTIONS NOT PERMITTED

**DOWJONES**

cloaked with a "qualified privilege," legal problems may arise when information advances outside permissible circles—those lacking a legitimate "need to know." Some states forbid the filing of defamation claims when communications were confined solely within the employer's organization. However, even some states adopting this pro-employer policy recognize that internal communications which occurred in the absence of a businesslike basis shouldn't be protected from defamation lawsuits. As a result, idle chatter or small talk aren't immune from legal action.

Judges have discretion when determining if plaintiffs' attorneys may ask that punitive damages be awarded. Statements motivated by malice or cruel intent serve as grounds for permitting jurors to consider awarding punitive damages. Defamatory remarks made in spite or meanness ignite jury fury and lead to larger than normal verdicts.

## Non-Defamatory Comments

# Idle chatter or small talk aren't immune from legal action

You also may have legal recourse if your employer passes along harmful, but accurate, information. For example, the Employee Polygraph Protection Act, a federal law, limits what private-sector employers may repeat about details learned when subjecting workers to "lie detector" tests. Federal and state laws also forbid employers from disclosing whether current or former employees had lodged complaints of illegal job discrimination. The Americans with Disabilities Act and many state laws addressing public disclosure of private facts forbid employers from leaking information about their staff members' physical ailments and emotional conditions.

### A Potent Claim

Employers generally fear defamation lawsuits more than discrimination claims. Federal and many states' laws cap the

amounts of money obtainable from most types of discrimination disputes. Employers having 14 or fewer workers are immune from liability under most federal and some state antidiscrimination laws. Federal law limits noneconomic damages to just $50,000 for employers having as few as 15 employees. Organizations with 500 or more employees don't have to pay federal discrimination verdict amounts exceeding $300,000 for emotional pain and punitive awards.

Verdicts in defamation claims aren't limited by employer size. Employers too tiny to be concerned with discrimination liability are as vulnerable as the largest corporations to the consequences of expensive defamation verdicts. Moreover, employers too small to be required to defend against discrimination lawsuits can find themselves paying high hourly fees to attorneys defending them against libel or slander allegations.

Defamation lawsuits can yield costly verdicts. Compensation typically is sought for the suffering of emotional pain and for reimbursement for economic damages such as lost wages. These lawsuits also commonly seek punitive damages to punish wrongdoers and deter others from acting similarly. The amount of money that can be awarded for punitive damages can exceed the amounts of money provided for emotional pain and economic damages, as occurred in the lawsuit Mr. Perez filed against Gillespie Motor.

Defamation lawsuits are not only costly to employers, they can be expensive to fellow workers who are accused of participating in the spread of defamation. Along with the employing organization, the person or persons accused of engaging in defamatory acts can also be held liable.

### Increasing Claims

Ironically, stepped-up efforts by employers to weed out undesirable employees may increase opportunities for defamation to

---

### Loose Lips

The following are some of the circumstances in which employers have been held liable or potentially liable in work-related defamation claims:

- A statement that a restaurant worker had been dishonest.
- A statement that a microcomputer specialist committed sabotage.
- A statement that a social-club employee stole petty cash.
- A statement (ascribing criminal conduct) made by a bank president who said a continuing investigation would clear innocent persons and that some people won't return to work due to revoked bonds.
- An accusation that a fellow corporate director embezzled funds.
- A statement to a newspaper by a savings-and-loan board member that its former president was "administratively incapable."
- A written statement that an investment banker was discharged for "questionable loyalty and ethics."
- An inquiry of co-workers as to whether a previously employed veterinarian had a drug or alcohol problem.
- Remarks that a systems engineer demonstrated poor cooperation and a lack of job knowledge.
- A statement to a potential employer that a previously employed sales executive was irrational, ruthless and disliked by staff, had a Jekyll-and-Hyde personality and was a sociopath.
- A report that an employee was a methadone user after a urine test was performed under questionable conditions.
- A statement to co-workers based on a questionable anonymous letter that a former staff member had a "drinking problem."
- A statement that a former construction project manager might be competent if aided by a large staff, coupled with "he no longer worked for us and that might say enough."

---

occur, says Elizabeth A. Glidden, an employment law attorney in Minneapolis. Employers have increased the number of background checks performed on new hires and longtime employees. They are also administering detailed performance reviews more frequently than ever, she notes. "All this information gathering increases the chance that incorrect information could be relayed to persons outside the 'need to know' sphere," says Ms. Glidden.

Add to the mix new technologies such as the Internet, e-mail, videoconferencing and video press releases and the potential ways of committing defamation keep growing. ■

---

This reprint prepared by the National Business Employment Weekly for informational purposes only. No copy of this reprint or any portion thereof may be made without the express written consent of the National Business Employment Weekly. For subscription information call: 800-JOB-HUNT (800-562-4868).

ARTICLE



erq
EMPLOYEE
RIGHTS
QUARTERLY

SPONSORED BY

NERI

NATIONAL
EMPLOYEE
RIGHTS
INSTITUTE

# Family and Medical Leave Act: Frequently Violated and Often Misunderstood

*The Family and Medical Leave Act (FMLA) is still relatively new and often not understood by employees and employers. Employees often aren't certain of their rights under the Act, and employers don't always understand what the Act allows and doesn't allow. This article examines the basic features of the Act and some of the major problems of interpretation.*

## By Loring N. Spolter

The federal government's newest workplace rights law states that mid- to large-size private sector employers and most governmental entities must hold open jobs for workers who require time off to obtain prenatal care, adopt children, care for newborn children, and attend to serious medical concerns confronting themselves or close family members. Nevertheless, investigators at the U.S. Department of Labor (DOL) have determined the law is violated with alarming frequency.

The Family and Medical Leave Act (FMLA) allows eligible employees to be able to take unpaid leaves of absences from work with assurances that they can return to their jobs. During the first four years after the enactment of the Act, the number of complaints filed with the DOL rose dramatically to more than 2,000 a year, and is continuing to rise.[1] Through June 30, 1997, the DOL's Wage and Hour Division received 11,795 complaints.[2]

Employers were found to have violated FMLA in over 59 percent of the 13,597 complaints filed with DOL since the law took effect in 1993.[3] Of the grievances lodged with DOL, 44 percent claimed the employer refused to permit the employee to return to work at the same or equivalent position, and 22 percent complained that leave was wrongly denied—two issues that are at the core of the FMLA.[4]

Although DOL reports "successfully resolving" 87 percent of the well-founded complaints it received, it does not disclose the criteria used to classify such outcomes.[5] Furthermore, DOL has filed only 29 FMLA lawsuits to date.[6] This means there is a mere one-in-278 chance of the government litigating a claim on behalf of any employee found to have a valid complaint. Persons believing they have had their FMLA rights violated are permitted to bypass the federal government by filing their own lawsuits, even without first notifying DOL of an existing grievance.[7]

*Loring N. Spolter, a trial attorney in Fort Lauderdale, Florida, practices in the field of employment discrimination. He has written numerous articles for the Wall Street Journal's National Business Employment Weekly.*

mitting to required medical examinations, attending mandated counseling sessions, appearing in court, and meeting with lawyers and physicians.[31]

- A serious health condition that makes the employee unable to perform the functions of his or her job.[32]
- Caring for the employee's spouse, parent, son, or daughter's serious health condition.[33] Leave may be sought to care for adult sons or daughters requiring psychological comfort, active assistance, or supervision in three or more activities of their daily living.[34] Daily living activities include providing transportation to and from medical care, and helping meet hygienic and nutritional needs.[35]

## Defining a "Serious Health Condition"

The key question is, when does a medical condition become sufficiently serious to be covered by FMLA? DOL regulations seek to define at what point an ailment, which at first seems minor, may actually become serious.[36] Although the regulations were intended to serve as guidelines, they have caused considerable confusion. Ordinarily, non-serious conditions include minor ulcers, routine dental or periodontal treatment, upset stomachs, common flu, non-migraine headaches, and earaches.[37] Inpatient care provided in hospitals or residential medical care facilities, accompanied by a temporary inability to work, is considered sufficiently serious.[38] Although DOL attempts to promote "brightline" tests, exceptions are rampant and there are few easy answers.

There are 87 FMLA rulings by trial and appellate courts appearing in the U.S. Code Annotated, a key legal reference source.[39] Of those, a mere 17 address issues involving serious health conditions, leaving too few cases to provide clear guidance as to when seemingly minor ailments become sufficiently serious health problems. Older federal employ-

> Once the employer has notice of a potential serious health condition, the employer has a duty to make inquiries to determine if the FMLA is applicable.

ment laws, such as Title VII, which relates to race, gender, national origin, and religion, have been interpreted in thousands of written court rulings over several decades.

Adding to the confusion, courts have ruled inconsistently on identical or nearly identical ailments. One trial court ruled that a daughter's upper respiratory infection was sufficiently serious for her mother to take FMLA leave to care for the child, although the mother, when simultaneously coming down with the same ailment plus another condition, gastroenteritis, did not meet the threshold. The daughter, who obtained initial care at an emergency room but was not admitted for an overnight hospital stay, was provided with prescription medication and received follow-up medical attention days later. The judge ruled that she was sicker than her mother, who was prescribed three types of medication by a physician who saw her only one time.[40]

Here's a sampling of court rulings addressing which ailments are sufficiently serious to qualify for FMLA leave.

**Deemed serious medical conditions:**

- Employee's atrial fibrillation, requiring at least two visits to physicians, with absences lasting more than three consecutive days.[41]
- Two doctor visits, in which prolonged grief was diagnosed, stemming from suicide by employee's son.[42]
- Seeking medical attention for panic attacks, rapid heartbeat, nervousness, and other ailments allegedly caused by sexual harassment at work.[43]
- Adult employee's chicken pox.[44]

**Deemed non-serious medical conditions:**

- Adverse reaction to allergy shot, causing swelling and itchiness to arm, where employee missed three days of work after speaking on the phone, but not meeting with her physician. No treatment or restrictions were ordered, although the physician did provide a note stating the employee was under

## Conclusion

Human resources professionals need to be vigilant when making decisions affecting the interests of employees who may be in need of FMLA leave. FMLA rights arise even for those employees not explicitly stating that they need FMLA benefits. In addition, there is often confusion as to whether ailments are sufficiently serious enough to trigger eligibility for FMLA leave. To date, there are too few FMLA case precedents to provide a comfortable degree of certainty as to how courts will evaluate employer decisions. Furthermore, FMLA violations are strict liability offenses creating automatic liability for economic damages caused even by good-faith administrative mistakes.

With no employer requirement to pay wages during leave periods, adminis-trative burdens and economic costs of FMLA compliance are minimal. Since few workers can afford to take unpaid leave, employees will not stampede to exercise their FMLA rights. Astute employers will appreciate that compliance with FMLA's provisions promotes employee goodwill. With employers scrambling to minimize staff turnover and reduce the high cost of replacing personnel, maintaining work positions for individuals requiring medical leave is an inexpensive way of holding onto existing employees and promoting staff loyalty.

Perceptive employers will appreciate that the expense of complying with FMLA, even in circumstances where the legal validity for leave is uncertain, will be well below the costs of defending against FMLA lawsuits.

## Endnotes

1. Richard T. Seymour & Barbara Berish Brown, *Equal Employment Law Update* 11-225 (Spring 1999).

2. Id.

3. U.S. Department of Labor, *Summary of Compliance Activity* (Aug. 5, 1993–Sept. 30, 1998).

4. Id.

5. Id.

6. Id.

7. 29 C.F.R. § 825.400(2) (1998); *Cehrs v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d 775 (6th Cir. 1998); 29 C.F.R. § 825.207.

8. 29 C.F.R. § 825.100(a).

9. Id.

10. Id. §§ 825.100(a), .200(a).

11. Id. §§ 825.209, .210.

12. Id. § 825.215.

13. Id. § 825.203.

14. Id. § 825.204.

15. Id. §§ 825.216(c), .217.

16. Id. § 825.218.

17. Id. § 825.109.

18. Id. § 825.108.

19. *Alden v. Maine*, 119 S.Ct. 2240 (1999) (FLSA); *Kimel v. Florida Board of Regents*, 120 S.Ct. 12 (2000) (ADEA). However, the Eleventh Amendment appears only to apply to a limited subset of actual state employees, and not to those of many political subdivisions. See, e.g., *Travelers Indemnity Co. v. School Bd. of Dade County*, 666 F.2d 505, 507 (11th Cir. 1982) (holding that for purposes of

54. *Brohm v. JH Properties, Inc.,* 149 F.3d 517, 4WH2d 1359 (6th Cir. 1998); *O'Hara v. Mt. Vernon Bd. of Ed.* 16 F.Supp.2d 868, 136 Lab. Cas. P33,767 (S.D. Ohio 1998).

55. 29 C.F.R. 825.303(b).

56. Id. § 825.110.

57. Id. § 825.305.

58. 29 U.S.C. § 2613.

59. 29 C.F.R. § 825.307(a).

60. 29 Id.

61. Id. § 825.307(a)(2).

62. Id. § 825.301(f).

63. Id. § 825.700.

# *Loring N. Spolter, P.A.*

Attorney at Law
International Building
2455 E. Sunrise Blvd.
Suite 807
Fort Lauderdale, Florida 33304

RE:    *McCarthy v. U.S.A. Protection, Inc.*
       Case No. 00-6013-CIV-GOLD

---

## TIME RECORDS

---

## FOR PROFESSIONAL SERVICES RENDERED:

| DATE | MATTER | TIME |
|------|--------|------|
| 10/22/99 | Initial interview with client | 0.5 hrs |
| 12/18/99 | Drafted Complaint, conducted corporate search, drafted summonses, drafted Civil Cover Sheet | 2.3 |
| 12/20/99 | Telephone call with client | 0.3 |
| 01/15/00 | Reviewed Return of Service | 0.2 |
| 01/16/00 | Reviewed Court Order | 0.2 |
| 02/16/00 | Reviewed case law and rules of procedure on obtaining defaults; drafted Motion for Entry of Default and Proposed Order | 3.4 |
| 03/03/00 | Drafted Renewed Motion for Entry of Default | 0.3 |
| 03/16/00 | Reviewed Clerk's Entry of Default | 0.2 |
| 04/25/00 | Telephone call with client; draft correspondence to client | 0.3 |
| 05/01/00 | Reviewed case law and rules of procedure on obtaining a default | 3.2 |

judgment; drafted Motion for Default Judgment and Proposed Order

| Date | Description | Hours |
|---|---|---|
| 06/05/00 | Reviewed Order Granting Plaintiff's Motion for Default Judgment | 0.3 |
| 06/10/00 | Reviewed law on the effects of default judgments; drafted Statement in Response to Order Granting Default Judgment | 2.7 |
| 08/11/00 | Reviewed Court's Order Granting Default Judgment | 0.2 |
| 08/30/00 | Reviewed case law on Fair Labor Standards Act; reviewed filed; telephone call with client; drafted Unilateral Stipulation | 5.7 |
| 09/25/00 | Drafted Motion for Continuance; telephone call with client | 0.7 |
| 09/26/00 | Drafted Proposed Jury Instructions and Verdict Form | 4.8 |
| 09/27/00 | Reviewed Order Setting Pretrial Conference; drafted Motion for Continuance | 0.4 |
| 09/29/00 | Reviewed Order Re-setting Pretrial Conference | 0.2 |
| 10/06/00 | Attended Pretrial Conference | 2.0 |
| 10/13/00 | Reviewed Court Order | 0.2 |
| 10/19/00 | Drafted Plaintiff's Notice of Filing Proposed Final Judgment; reviewed file | 0.5 |
| 10/29/00 | Reviewed Court's Order to Show Cause | 0.2 |
| 11/13/00 | Telephone with client | 0.2 |
| 11/20/00 | Drafted correspondence to client | 0.2 |
| 11/30/00 | Reviewed law on attorneys' fees; drafted Motion for Attorneys' Fees; reviewed time records; made mathematical calculations; drafted affidavit | 3.8 |
| 12/01/00 | Researched law on taxing costs; drafted Motion to Tax Costs | 2.0 |

**TOTAL (as of 12/01/00)**                                                         **35.0 hrs**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 00-6013-CIV-GOLD/SIMONTON

DANIEL MCCARTHY,

      Plaintiff,

v.

U.S.A. PROTECTION, INC., formerly
known as R.A. SECURITY SYSTEMS,
INC., a Florida corporation,

      Defendant.

_____/

## AFFIDAVIT OF CHRISTOPHER C. SHARP

STATE OF FLORIDA     )
                   ) ss
COUNTY OF BROWARD  )

      The undersigned, CHRISTOPHER C. SHARP, first being duly sworn according to law, deposes and states:

      1.    I am the sole shareholder in my law firm Christopher C. Sharp, P.A. I have been practicing employment discrimination law for several years, and at one time worked for Amlong & Amlong, P.A.

      2.    I share office space with Mr. Spolter, and have over the years co-counseled employment discrimination cases with him. Mr. Spolter is a consummate professional. Mr. Spolter is well-versed in al aspects of employment, and has conducted several trials.

      3.    I have first-hand knowledge that typical attorneys' fees, in the Fort Lauderdale, Florida area, in this area of the law range from approximately $175.00 to $350.00 per hour.

4.    I have reviewed all of the legal work performed in this case, and the attached time records, and I believe that the all of the legal work was necessary for the proper prosecution of this cause, and that it was performed well within a reasonable time.

5.    Having known, worked beside, and co-counseled cases for Mr. Spolter for several years, I believe that the $250.00 hourly fee that he seeks in this case is commensurate with his knowledge and experience.  I know that Mr. Spolter has concentrated in the area of labor and employment law for the past seven (7) years, and that he has been practicing law for approximately 11 years.  I know that he is admitted to practice law in Florida, New York, and Connecticut, and that he has written extensively in the area of employment discrimination law, and, among other places, I have been published several times in *The Wall Street Journal's* National Business Employment Weekly.


FURTHER AFFIANT SAYETH NAUGHT


Christopher C. Sharp

2

SWORN TO and SUBSCRIBED before me this ___1st___ day of _A.Cccmbcc_, 2000, by Christopher C. Sharp, who is _personally known_ to me or who produced _____, as identification, and who did take an oath.

_____
NOTARY PUBLIC, STATE OF FLORIDA

My Commission Expires:



Susan J. Corey
MY COMMISSION # CC941750 EXPIRES
June 4, 2004
BONDED THRU TROY FAIN INSURANCE, INC.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 99-7373-CIV-DIMITROULEAS/JOHNSON

ROMEO CAICEDO,

      Plaintiff,

v.

SHOP & SAVE THRIFT, INC., A
Florida Corporation and
TAREK CHAHINE,

      Defendants.

_____/

### AFFIDAVIT OF PETER T. MAVRICK

    1.    I am an attorney at law who is licensed in Florida. I have had my own legal practice in Fort Lauderdale, Florida for approximately three years. My practice is located at 1 East Broward Boulevard, Suite 700, Fort Lauderdale, FL 33301. Employment law matters comprise approximately 75 % of my practice. I obtained my undergraduate degree from the University of Michigan in 1989 and my law degree from Harvard Law School in 1992.

    2.    I have been a member of the Florida Bar since 1996 and have been a member of the California State Bar since 1992. I am an active member of the Florida Chapter of the National Employment Lawyers Association. I have also attended numerous meetings of the Broward County Bar Association's Labor and Employment Law Section and am serving as Co-Chairperson of that Section. I have been a guest lecturer at the Broward County Bar Association's Labor and Employment Law Section and at statewide meetings of the Florida Chapter of the National Employment Lawyers Association.

    3.    I have been admitted to practice before the United States District Court for the Southern, Middle and Northern District Courts of Florida since 1997. I was admitted to practice

before the United States District Court for the Central District of California in 1993.

4.     I have attended a conference where Loring N. Spolter was the guest lecturer at the Florida Chapter of the National Employment Lawyers Association. I found Mr. Spolter's lecture to be thoughtful, insightful, and professional.

5.     In the course of my practice, I have represented clients in more than 35 employment law matters under Federal and state law.

6.     I have read the civil complaint in this case and the final order.   Mr. Spolter has advised me that fewer than 50 hours of total attorney time were utilized in litigating the case on behalf of the plaintiff. What strikes me is that Mr. Spolter, along with the two other attorneys who assisted him, were able to keep their total hours worked to such a small number, because even in cases such as this where there is a small amount of money in controversy, it generally requires substantially more time to handle these types of cases. This is an especially small number of hours in view of the fact that the case was handled through trial.

7.     From the above, I have found Mr. Spolter to be skillful and prepared as a trial lawyer and well versed in the field of employment law.

8.     In my opinion, Mr. Spolter's fee of $250 per hour is a reasonable rate within South Florida for an attorney of Mr. Spolter's skill, reputation and experience.   To my knowledge, attorneys with experience and skills similar to Mr. Spolter bill and are paid a comparable hourly rate in Federal civil litigation of comparable complexity to employment law litigation.

Under penalty of perjury, I swear that the foregoing is true and correct.

*Peter T. Mavrick*

PETER T. MAVRICK

STATE OF FLORIDA        }
                        }        SS:
COUNTY OF BROWARD        }

I HEREBY CERTIFY that on this 24 day of October, 2000, before me, an officer duly authorized in the State aforesaid to take acknowledgments, personally appeared PETER T. MAVRICK, who executed the foregoing interrogatories and acknowledged to and before me that the foregoing answers are true and correct to the best of his knowledge and belief, and who is personally known to me or produced FL DL M1626786722 as identification.

*Nicole Star Jaquith*
Notary Public

Nicole Star Jaquith
Printed or Typed Name of Notary

CC 918582
Commission No.

March 14 2004
My Commission Expires



NICOLE STAR JAQUITH
MY COMMISSION # CC 918582
EXPIRES: March 14, 2004
Bonded Thru Notary Public Underwriters

**LORING N. SPOLTER, P.A.**
International Building, Suite 807
2455 E. Sunrise Boulevard
Fort Lauderdale, FL  33319
(954) 728-3494

### OWED WAGES CONTINGENCY FEE AGREEMENT

I hereby retain LORING N. SPOLTER, P.A. as my attorney to represent me in my claim for owed wages or other type of owed compensation from: *RA Security Systems*
and any and all other parties who might be liable for the amount of pay or compensation which I am owed.

I understand that this agreement consists of both a non-refundable retainer for legal fees as well as a contingency fee agreement (This contract may be cancelled by written notification to the attorney at any time within three business days of the date the contract was signed).

The undersigned client, has, before signing this contract, received and read the Statement of Client's Rights, and understands each of the rights set forth therein.  The undersigned client has signed the Statement of Client's Rights, and has received a copy to keep and to refer to while being represented by the undersigned attorney.

This contract may be cancelled by written notification to the attorney at any time within three business days of the date the contract was signed, as shown below, and if cancelled the client shall not be obligated to pay any fees to the attorney for work performed during that time.  The attorney is entitled to be reimbursed for such amount as he has reasonably advanced on behalf of the client.

The client understands that this employment is upon a contingent fee basis.  If no recovery is made, the client does not have to pay the attorney any attorney's fees other than those which have been agreed to for the retainer fee.  However, the client does agree to be responsible for any and all expenses paid by the attorney in the investigation, handling and representation of this case, regardless as to successful or unsuccessful outcome of this case, including but not limited to stenographic fees, court filing fees, photocopy fees, long distance phone toll charges, creation and production of trial exhibits, public records searches / records acquisition fees and other fees for case-oriented expenses.

Attorney's fees in this case will be earned according to the following terms, whether they relate to general damages, special damages and / or punitive damages:

1)    40% of any recovery up to $1 million through the trial of the case;

2)    30% of any recovery between $1 - $2 million;

3)    20% of any recovery in excess of $2 million;

4)    If all defendants admit liability at the time of filing their
initial answers and request a trial on damages only:
a)    40% of any recovery up to $1 million through trial;
b)    20% of any recovery between $1 - $2 million;
c)    15% of any recovery in excess of $2 million;

5)    An additional 5% of any recovery after notice of appeal is filed or
post judgment relief or action is required for recovery on the judgment;

6)    Such other fees as may be awarded by the Court, as applicable under
the laws of the State of Florida and the United States, whichever is
greater;

7)    In the event attorney's fees are awarded to the client as a result
of settlement, arbitration or trial or other means, then LORING N. SPOLTER,
P.A. shall be entitled to receive the court awarded attorney fee in excess
of the amount as may be determined by the contingent fee schedule.   Such
excess shall be earned by LORING N. SPOLTER, P.A. and paid directly to
LORING N. SPOLTER, P.A.

8)    If there is no separate award of fees, you owe LORING N. SPOLTER,
P.A. attorney's fees based upon the standard contingent fee formula
described in this agreement and applied against monetary recovery.

### STATUTORY RECOVERABLE LIMITS / ATTORNEYS FEES LIMITATIONS

    Certain claims against Governmental entitles may have statutory
limits on the maximum amount recoverable to the client and a ceiling on
attorney's fees.  In all cases controlled by these laws, the maximum amount
permitted under the law shall replace any amount stated elsewhere in this
contract.

### STRUCTURED SETTLEMENTS

    In cases where the client is to receive a recovery which will be paid
to the client on a future structured or periodic basis, the contingent fee
percentage shall only be calculated on the cost of the structured verdict
or settlement or, if the cost is unknown, on the present money value of the
structured verdict or settlement; whichever is less.  If the damages and
fee are to be paid out over the long term future schedule then this
limitation does not apply.  No attorney may separately negotiate with the
defendant for that attorney's fee in a structured verdict or settlement
where such separate negotiations would place the attorney in the position
of a conflict of interest.

### PREPAYMENT OF COSTS AND EXPENSES

    The client agrees to provide and maintain a balance in the attorney
trust account for payment of costs and expenses.  The attorney will draw
against this amount for monthly billing for costs and expenses.   This
amount may be raised (and will likely be substantially raised) at the
discretion of the attorney, in order to meet the attorney's estimate of
what will be required to complete the matter.
    The attorney will provide a detailed statement, which shall include
an itemization of all billed costs and expenses.

2

Payments into the trust account shall be made no later than 35 days after mailing. The amount of fees and costs not paid by their due date shall, thereafter, incur compound interest at the rate of 1.5% per month (18% per year).

Failure to pay the bill on schedule may result, at the attorney's option, in a requirement of a deposit sufficient to cover the attorney's estimate of the fees and costs likely to occur during continued representation.

All costs for which LORING N. SPOLTER, P.A. has not been previously reimbursed are to be paid first from any recovery received in the case. The calculation of the appropriate attorney's fees under this agreement shall be after the deduction of these costs.

## INJUNCTIVE AND DECLARATORY RELIEF

If this action should involve the need to seek injunctive or declaratory relief, then LORING N. SPOLTER, P.A. is to be separately compensated for his time on the injunctive relief portion of the case solely from a court award of attorney's fees, and not from any damages award. Accordingly, any attorneys' fees awarded for the injunctive or declaratory relief aspects of the case belong exclusively to counsel and shall not be included in the fee computation explained in the agreement.

## SETTLEMENT OFFERS

If a settlement offer is made to the client which the attorney recommends that the client accepts and the client decides not to accept the offer, the client agrees to pay the attorney the greater of an hourly basis for all future work at the attorney's rate of $200.00 hourly or the previously agreed to percentage. Additionally, the client will reimburse all expenses and costs, under the terms and conditions specified in this agreement.

## LIEN

The client grants the attorney a lien on any and all causes of action asserted in any court action initially brought on his or her behalf under this agreement. The lien will be for any sums due and owing to the attorney at the conclusion or termination of services. The lien will attach to any recovery the client may obtain in the court action, whether by arbitration awarded, judgment, settlement or otherwise. The lien will remain in effect even if LORING N. SPOLTER, P.A. is no longer your attorney for any reason.

## DISCHARGE, TERMINATION, WITHDRAWAL AND / OR CONCLUSION

The client may discharge the attorney at any time and the attorney may withdraw with client's consent or may withdraw for good cause without the consent of the client. Any of the following constitutes good cause for attorney to withdraw from this case: 1) breach of contact by client; 2) client's refusal to cooperate or to follow advice on a material matter; 3) rejection of a settlement offer that attorney recommends; and / or 4) any fact or circumstance that would render continuing legal representation to be unlawful or unethical.

Upon termination or conclusion of legal services, all unpaid charges

3

for services rendered and costs incurred or advanced through the termination or conclusion date shall become immediately due and payable. Upon client's demand, attorney will deliver to the client a photocopy of the file at or after the termination or conclusion of services and that the copying of a duplicate set of the file constitutes costs which the client owes to the attorney.     The attorney may also terminate representation of the client, upon giving the client reasonable advance notice.

### POSSIBLE RISK OF OBLIGATION OF OPPOSING SIDE'S FEES & COSTS

In the event that the presiding judge dismisses the lawsuit upon his / her belief that it lacks sufficient strength to continue on through trial, or should the case be lost at trial, judges have the discretionary right to require that the unsuccessful party reimburse the "winning" side for certain legal costs and expenses.


Client agrees that upon written notice, LORING N. SPOLTER, P.A. may terminate his representation under the terms of this agreement. I agree to keep my attorney advised of my whereabouts at all times and to cooperate in the preparation and investigation of the case, to appear on reasonable notice for all office conferences, depositions and court appearances and to comply with all requests made by my attorney in connection with the preparation and presentation of my case.

DATED this _33rd_ day of _OCTOBER_, 199_9_, at Broward County, Florida.

_Daniel D. McCarty_
Client Signature

_DANIEL D. McCARTHY_
Client Name (Printed)

_10 - 33 - 99_
Date Client Entered Agreement

_____
LORING N. SPOLTER, ESQ.

_10/27/99_
Date Attorney Entered Agreement


file: OWEDWAGE

4

LORING N. SPOLTER, P.A.

STATEMENT OF CLIENT'S RIGHTS

Before you, the prospective client, arrange a contingency fee agreement with a lawyer, you should understand this Statement of your rights as a client.  This Statement is not a part of the actual contract between you and your lawyer, but as a prospective client, you should be aware of these rights:

1. There is no legal requirement that a lawyer charge a client a set fee or a percentage of money recovered in a case.  You, the client, have the right to talk with your lawyer about the proposed fee and to bargain about the rate or percentage as in any other contract.  If you do not reach an agreement with one lawyer, you may talk with other lawyers.

2. Any contingency fee contract must be in writing and you have three (3) business days to reconsider the contract.  You may cancel the contract without any reason if you notify your lawyer within three (3) business days of signing the contract.  If you withdraw from the contract within the first three (3) days, you do not owe the lawyer a fee although you may be responsible for the lawyer's actual costs during this time. If you lawyer begins to represent you, your lawyer may not withdraw from the case without giving you notice, delivering necessary papers to you, and allowing you time to employ another lawyer.  Often, your lawyer must obtain court approval before withdrawing from a case.  If you discharge your lawyer without good cause after the three day period, you may have to pay a fee for the work the lawyer has done.

3. Before hiring a lawyer, you, the client, have the right to know about the lawyer's education, training and experience.  If you ask, the lawyer should tell you specifically about his or her actual experience dealing with cases similar to yours.  If you ask, the lawyer should provide you with information about special training or knowledge and give you this information in writing if you request it.

4. Before signing a contingency fee contract with you, a lawyer must advise you whether he or she intends to handle your case alone or whether other lawyers will be helping with the case.  If your lawyer intends to refer the case to other lawyers, he or she should tell you what kind of fee sharing arrangement will be made with the other lawyers.  If lawyers from different law firms will represent you, at least one lawyer from each firm must sign the contingency fee agreement.

5

5. If your lawyer intends to refer your case to another lawyer or counsel with other lawyers, your lawyer should tell you about that at the beginning. If your lawyer takes the case and after decides to refer it to another lawyer or to associate with other lawyers, you should sign a new contract which includes the new lawyers. You, the client, also have the right to consult with each lawyer working on your case and each lawyer is legally responsible to represent your interests and is legally responsible for the acts of the other lawyers involved in the case.

6. You, the client, have the right to know in advance how you will need to pay the expenses and the legal fees at the end of the case. If yo pay a deposit in advance for costs, you may ask reasonable questions about how the money will be or has been spent and how much of it remains unspent. Your lawyer should give you a reasonable estimate about future necessary costs. If your lawyer agrees to lend or advance you money to prepare or research the case, you have the right to know periodically how much money your lawyer has spent on your behalf. You also have the right to decide, after consulting with your lawyer, how much money is to be spent to prepare a case. If you pay the expenses, you have the right to decide how much to spend. Your lawyer should also inform yo whether the fee will be based on the gross amount recovered or on the amount recovered minus the costs.

7. You, the client, have the right to be told by your lawyer about possible adverse consequences if you lose the case. Those adverse consequences might include money which you might have to pay to your lawyer for costs, and liability you might have for attorney's fees to the other side.

8. You, the client, have the right to receive and approve a closing statement at the end of the case before you pay any money. The statement must list all of the financial details of the entire case, including the amount recovered, all expenses and a precise statement of your lawyer's fee. Until you approve the closing statement you need not pay any money to anyone, including your lawyer. You also have the right to have every lawyer or law firm working on your case sign this closing statement.

9. You, the client, have the right to ask your lawyer at reasonable intervals how the case is progressing and to have these questions answered to the best of your lawyer's ability.

10. You the client, have the right to make the final decision regarding the settlement of a case. Your lawyer must notify you of all offers of settlement before and after the trial. Offers during the trial must be immediately communicated and you should consult with your lawyer regarding whether to accept a settlement. However, you must make the final decision to accept or reject a settlement.

11. If at any time, you, the client, believe that your lawyer has charged an excessive or illegal fee, you, the client, have the right to report this matter to the Florida Bar, the agency that oversees the practice and behavior of all lawyers in Florida. For information on how to reach The Florida Bar, call (800) 342-8060, or contact the local bar association.

Any disagreement between you and your lawyer about a fee can be taken to court and you may wish to hire another lawyer to help yo resolve this disagreement. Usually fee disputes must be handled in a separate lawsuit.

TO ACKNOWLEDGE RECEIPT OF THIS DOCUMENT:

_____
Client Signature

10-22-99
_____
Date

_____
Attorney Signature

10/22/99
_____
Date

7