UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 00-6013-CIV-GOLD/SIMONTON

DANIEL MCCARTHY,

    Plaintiff,

v.

U.S.A. PROTECTION, INC., formerly
known as R.A. SECURITY SYSTEMS,
INC., a Florida corporation,

    Defendant.
_____/

**PLAINTIFF'S RESPONSE TO MOTION FOR PROTECTIVE ORDER**

Plaintiff, DANIEL MCCARTHY ("McCarthy"), through his undersigned attorneys, files this Response to Motion for Protective Order, and states:

**BACKGROUND**

This is a wage and hour case arising out of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* On November 6, 2000, the Court issued a Final Judgment in McCarthy's favor for $28,535.52. The Defendant, which was a family owned business, defaulted. McCarthy now seeks to hold Robert Odierna Jr. and his wife Mai-Lyn Kozlowski personally liable for the judgment, because they ran the day-to-day operations of the Defendant, and therefore functioned as officer, directors, and/or shareholders of the Defendant.

To further holding Odierna Jr. and his wife personally liable, McCarthy served a subpoena *duces tecum* on Odierna Jr. seeking to have Odierna Jr. bring his personal financial documents with him so that undersigned counsel could review them and question him about them. Odierna Jr. filed a Motion for Protective Order seeking to stop the taking of any

deposition or production of Odierna Jr's financial information. Odierna Jr.'s Motion for Protective Order is supported by an affidavit from Odierna Jr., which contains the following averment from Odierna Jr.: "I am not nor have I ever been a director, officer, or shareholder of U.S.A. PROTECTION, INC. or R.A. SECURITY SYSTEMS, INC." (*Affidavit of Robert Odierna Jr.* ¶ 4). This averment is contradicted by the affidavit submitted by Daniel McCarthy, which is attached hereto as Exhibit "1", which sets forth how Odierna Jr. functioned as an officer, director, and as a shareholder of the Defendant. As such, Odierna Jr. is unable to satisfy his heavy burden to show that a protective order should issue.

## MEMORANDUM OF LAW

### I. THE LEGAL STANDARD FOR THE ISSUANCE OF A PROTECTIVE ORDER

Protective orders are entered for "good cause." *Glenmede Trust Co. v. Thompson*, 56 F.3d 476 (3d Cir. 1995) (stating that good cause is established when disclosure will cause clearly defined and serious injury). The party seeking the protective order has the burden of showing that good cause exists by stating particular and specific facts. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 (1981). Federal Rule of Civil Procedure 26(c) specifically instructs the court to limit the frequency or extent of discovery if justice so requires to protect a party or witness from annoyance, embarrassment, oppression, or undue burden or expense. Rule 26(b)(1) instructs the court to limit the frequency or extent of discovery if:

> (i) the discovery sought is unreasonably cumulative or is obtainable from a more convenient or less burdensome or expensive source, (ii) the party seeking the discovery has had ample opportunity to obtain the information, or (iii) the discovery is unduly burdensome or expensive taking into account the circumstances of the particular case.

Steven Baicker-McKee, *Federal Civil Rules Handbook*, 411 (1998 ed.).

"The burden is upon the movant to show the necessity of [a protective order's] issuance,

which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements." *In re Terra Int'l, Inc.*, 134 F.3d 302, 306 (5th Cir. 1998). In this case, Robert Odierna, Jr. has not set forth any "particular and specific demonstration of fact" showing that he is entitled to a protective order; rather, he has merely put forth "stereotyped and conclusory statements," such that a protective order should not be issued, because he has merely averred that: "I am not nor have I ever been a director, officer, or shareholder of U.S.A. PROTECTION, INC., or R.A. SECURITY SYSTEMS, INC." (*Robert Odierna's Affidavit* ¶ 4).

## II. ROBERT ODIERNA, JR. CANNOT SHOW THAT A PROTECTIVE ORDER SHOULD ISSUE, BECAUSE WHETHER HE WAS AN OFFICER, DIRECTOR, AND/OR SHAREHOLDER OF THE DEFENDANTS IS IN DISPUTE AS EVIDENCED BY DANIEL McCARTHY'S AFFIDAVIT

McCarthy worked for R.A. Security Systems, Inc. ("R.A. Security")[1] in November through December of 1997, and from June, 1998 through September, 1999. (*Affidavit of Daniel McCarthy* ¶ 2). McCarthy worked in the telemarketing department for R.A. Security during this entire time. *Id.* During this entire time, Robert Odierna, Jr. ran the day-to-day operations of R.A. Security. *Id.* If Odierna Jr. was not technically an officer, director, or shareholder of R.A. Security, he certainly was an officer, director, and shareholder because he acted as such in fact. *Id.* Odierna Jr. held himself out as and conducted himself as an officer, director, and shareholder. *Id.* Odierna Jr. held himself out as the president of R.A. Security. *Id.* Odierna, Jr. functioned in a manner that a chief executive officer would function. *Id.* Thus, if Odierna Jr. was not in fact an officer, director, or shareholder, he performed as such.

---

[1] R.A. Security changed its name to U.S.A. Protection Services, Inc. sometime between September, 1999 through June, 2000. (*Affidavit of Daniel McCarthy* ¶ 3).

3

During the time that McCarthy worked for R.A. Security, he reported to Robert Odierna, Jr., whom he saw a on a daily basis. *Id.* ¶ 4. Robert Odierna, Jr.'s father would come to R.A. Security's offices approximately once per week, but sometimes not for as much as one month at a time. *Id.* Mai-Lyn Kozlowski, Robert Odierna Jr.'s wife, was present every day at R.A. Security and ran the company with her husband. *Id.* Odierna Sr.'s role with R.A. Security was something akin to the chairman of the board. *Id.*

Robert Odierna, Jr. and Kozlowski had absolute hiring power, firing power, contracting authority, authority over insurance matters, and authority over legal matters. *Id.* ¶ 5. Odierna Jr. functioned as the chief executive officer of R.A. Security, because no corporate official working at R.A. Security's company headquarters in Pompano Beach had a higher rank or more authority than Odierna Jr. *Id.* Kozlwoski ran payroll (and signed checks for the company, but did not sign payroll paychecks) and the credit department. *Id.*

R.A. Security's Pompano Beach office was its corporate headquarters, and it had offices in Miami, Fort Myers, Pensacola, Tampa, Orlando, and Jacksonville. *Id.* ¶ 6. All of the offices reported Robert Odierna, Jr. at the Pompano Beach office daily by telephone. *Id.* Robert Odierna Jr. would set the sales goals for these other offices, and communicate with them daily as to how business was progressing, how it could be improved, what equipment was needed etc. *Id.*

Robert Odierna Jr. co-mingled his personal funds with funds from R.A. Security. *Id.* ¶ 7. For example, McCarthy used one of R.A. Security's Federal Express accounts several times which Robert Odierna Jr. made him pay for personally in March, 1999. *Id.* At Robert Odierna Jr.'s request, McCarthy paid him $100.00 in cash, which he placed in his pocket, and did not deposit it as R.A. Security funds. *Id.*

In February, 1999, McCarthy needed $3,200.00 worth of computer software for his own use, and Robert Odierna Jr. agreed to purchase the software for McCarthy on his personal American Express charge card, and the $3,200.00 was later deducted from McCarthy's paychecks. *Id.* ¶ 8. Also in February, 1999, McCarthy hired several telemarketers three of whom needed desks. *Id.* ¶ 9. McCarthy told Odierna Jr. that he needed the three desks, and Odierna Jr. and McCarthy went to Office Depot and Odierna Jr. purchased the three desks with his personal American Express charge card, and later paid cash out of his personal pocket to have the desks assembled. *Id.*

Odierna Jr. hired Rob Anderson as a subcontractor for handyman purposes, who worked on Odierna Jr.'s personal home and the business office in Pompano beach and Miami where R.A. Security operated, but Anderson was paid by R.A. Security, even for the work done on Odierna Jr.'s home. *Id.* ¶ 10. In or about the summer of 1999, a large supplier of equipment of R.A. Security's (ITI Corporation out of Minnesota) telephoned Odierna Jr. requesting payment for equipment, and Odierna Jr. instructed R.A. Security's bookkeeper to issue a check to ITI for $25,000.00. *Id.* ¶ 11. Odierna Jr. signed all of the checks drafted by R.A. Security. *Id.* No other office of R.A. Security in the State of Florida drafted checks. Odierna Jr. drafted the checks for payroll, expenses, rent, utilities, insurance, supplies, and all other reasons for which R.A. Security would need checks drafted. *Id.*

Odierna Jr. contracted with Pioneer Telephone Company out of Rochester, New York for long distance service for R.A. Security. *Id.* ¶ 12. The decision by Odierna Jr. to enter into this contract was solely his; he needed to obtain authority from no other person. *Id.* Odierna Jr. boasted to McCarthy about the good deal he made with Pioneer. *Id.* Odierna Jr. contracted with an air conditioning company to repair the air conditioning system in the building owned by

Security Zone, Inc., a predecessor to R.A. Security, also owned by the Odierna family. *Id.* ¶ 13. McCarthy was there when the air conditioning person came by to give the estimate for the repairs. *Id.* Security Zone, Inc. leased the entire building to R.A. Security. *Id.* Odierna Jr. evicted tenants out of the building once leased by R.A. Security. *Id.* ¶ 14. Odierna Jr. needed to obtain no authority to so evict. Id. Odierna Jr. would also negotiate leases with other tenants to whom he rented out offices in the building. *Id.* McCarthy was present several times when Odierna Jr. leased these offices to tenants. *Id.* Accordingly, Odierna Jr. was running the company to such an extent that he was in fact an officer, director, and/or shareholder. He needed authority from no one to run any aspect of the business in the way that he chose. Thus, he is properly held personally liable for the Defendant's FLSA violations.

## **CONCLUSION**

Based on the foregoing, McCarthy respectfully requests that this Court deny Odiern Jr.'s Motion for Protective Order, and compel production of the information that McCarthy requested pursuant to his subpoena to Odierna Jr., and order that Odierna Jr. submit to a deposition.

Attorney for the Plaintiff
Loring N. Spolter, P.A.
International Building
2455 E. Sunrise Blvd.
Suite 807
Fort Lauderdale, FL 33304
Tel. (954) 728-3494
Fax (954) 563-2252

By:_____
Loring N. Spolter, Esq.
Fla. Bar No. 864196

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing had been duly furnished by U.S. mail to: Rod Steadman, Registered Agent of the above-named Defendant, 19371 S.W. 118th Court, Miami, Florida 33177, Robert Odierna, Sr. or Jr., c/o Go Wireless, 3399 N.W. 72nd Avenue, Suite 201, Miami, Florida 33179, and Raymond Miller, Esq., Gunster, Yoakley, Stewart, P.A., Suite 3400, One Biscayne Tower, 2 South Biscayne Boulevard, Miami, Florida 33131, this 28 day of February, 2001.

By: _____
Loring N. Spolter, Esq.
Fla. Bar No. 864196

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 00-6013-CIV-GOLD/SIMONTON

DANIEL MCCARTHY,

    Plaintiff,

v.

U.S.A. PROTECTION, INC., formerly
known as R.A. SECURITY SYSTEMS,
INC., a Florida corporation,

    Defendant.
_____/

**AFFIDAVIT OF DANIEL McCARTHY**

STATE OF FLORIDA    )
                                ) ss
COUNTY OF BROWARD   )

    The undersigned, DANIEL McCARTHY, first being duly sworn according to law, deposes and states:

    1.    I am over the age of 18 years old, and I am of sound mind and body, and otherwise *sui juris*.

    2.    I worked for R.A. Security Systems, Inc. ("R.A. Security") from November through December of 1997, and June 1998 through September, 1999. I worked in the telemarketing department for R.A. Security during this entire time. During this entire time, Robert Odierna, Jr. ran the day-to-day operations of R.A. Security. If Odierna Jr. was not technically an officer, director, or shareholder of R.A. Security, he certainly was an officer, director, and shareholder because he acted as such in fact. Odierna Jr. held himself out as and conducted himself as an officer, director, and shareholder. Odierna Jr. held himself out as the

# EXHIBIT 1

president of R.A. Security. Odierna, Jr. functioned in a manner that a chief executive officer would function. Thus, if he was not in fact an officer, director, or shareholder, he performed as such.

3.      R.A. Security changed its name to U.S.A. Protection Services, Inc. sometime between September, 1999 through June, 2000.

4.      During the time that I worked for R.A. Security I reported to Robert Odierna, Jr., whom I saw a on a daily basis. Robert Odierna, Jr.'s father would come to R.A. Security's offices approximately once per week, but sometimes not for as much as one month at a time. Mai-Lyn Kozlowski, Robert Odierna Jr.'s wife, was present every day at R.A. Security and ran the company with her husband. I seek to hold both Robert Odierna Jr. and Mai-Lyn Kozlowski personally liable for the debts of R.A. Security. Odierna Sr.'s role with R.A. Security was something akin to the chairman of the board.

5.      Robert Odierna, Jr. and Kozlowski had absolute hiring power, firing power, contracting authority, authority over insurance matters, and authority over legal matters. Odierna Jr. functioned as the chief executive officer of R.A. Security, because no corporate official working at R.A. Security's company headquarters in Pompano Beach had a higher rank or more authority than Odierna Jr. Kozlwoski ran payroll (and signed checks for the company, but did not sign payroll paychecks) and the credit department.

6.      R.A. Security's Pompano Beach office was its corporate headquarters, and it had offices in Miami, Fort Myers, Pensacola, Tampa, Orlando, and Jacksonville. All of the offices reported Robert Odierna, Jr. at the Pompano Beach office daily by telephone. Robert Odierna Jr. would set the sales goals for these other offices, and communicate with them daily as to how business was progressing, how it could be improved, what equipment was needed etc.

7. Robert Odierna Jr. co-mingled his personal funds with funds from R.A. Security. For example, I used one of R.A. Security's Federal Express accounts several times which Robert Odierna Jr. made me pay for personally. At Robert Odierna Jr.'s request, I paid him $100.00 in cash, which he placed in his pocket, and did not deposit it as R.A. Security funds. This occurred in March, 1999.

8. I needed $3,200.00 worth of computer software for my own use, and Robert Odierna Jr. agreed to purchase the software for me on his personal American Express charge card, and the $3,200.00 was later deducted from my paychecks. This occurred during February, 1999.

9. In February, 1999, I hired several telemarketers three of whom needed desks. I told Odierna Jr. that I needed the three desks, and Odierna Jr. and I went to Office Depot and Odierna Jr. purchased the three desks with his personal American Express charge card, and later paid cash out of his personal pocket to have the desks assembled.

10. Odierna Jr. hired Rob Anderson as a subcontractor for handyman purposes, who worked on Odierna Jr.'s personal home and the business office in Pompano beach and Miami where R.A. Security operated, but Anderson was paid by R.A. Security, even for the work done on Odierna Jr.'s home.

11. In or about the summer of 1999, a large supplier of equipment of R.A. Security's (ITI Corporation out of Minnesota) telephoned Odierna Jr. requesting payment for equipment, and Odierna Jr. instructed R.A. Security's bookkeeper to issue a check to ITI for $25,000.00. Odierna Jr. signed all of the checks drafted by R.A. Security. No other office of R.A. Security in the State of Florida drafted checks. Odierna Jr. drafted the checks for payroll, expenses, rent,

utilities, insurance, supplies, and all other reasons for which R.A. Security would need checks drafted.

12. Odierna Jr. contracted with Pioneer Telephone Company out of Rochester, New York for long distance service for R.A. Security. The decision by Odierna Jr. to enter into this contract was solely his; he needed to obtain authority from no other person. Odierna Jr. boasted to me about the good deal he made with Pioneer.

13. Odierna Jr. contracted with an air conditioning company to repair the air conditioning system in the building owned by Security Zone, Inc., a predecessor to R.A. Security, also owned by the Odierna family. I was there when the air conditioning person came by to give the estimate for the repairs. Security Zone, Inc. leased the entire building to R.A. Security.

14. Odierna Jr. evicted tenants out of the building once leased by R.A. Security. Odierna Jr. needed to obtain no authority to so evict. Odierna Jr. would also negotiate leases with other tenants to whom he rented out offices in the building. I was present several times when Odierna Jr. leased these offices to tenants.

FURTHER AFFIANT SAYETH NAUGHT,

*/s/ Daniel McCarthy*
Daniel McCarthy

SWORN TO and SUBSCRIBED before me this 21st day of February, 2001, by Daniel McCarthy, who is personally known to me or who produced Driver's License, as identification, and who did take an oath.

*[Signature]*
NOTARY PUBLIC, STATE OF FLORIDA

My Commission Expires:

ELETHIA S. SINCLAIR
My Comm Exp. 4/20/04
No. CC 929993
[ ] Personally Known [ ] Other I.D.

5